UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ X
                                                            :
HSIEH LIANG YEH,                                            :
                                                            :          18 Civ. 6018 (PAE)
                                           Plaintiff,       :
                                                            :          OPINION & ORDER
                        -v-                                 :
                                                            :
HAN DYNASTY, INC., HAN DYNASTY UPPER WEST    :
SIDE CORP., and LUNG-LUNG SHEN CHIANG,                      :
                                                            :
                                          Defendants.       :
                                                            X
------------------------------------------------------------------------

PAUL A. ENGELMAYER, District Judge:

Plaintiff Hsieh Liang Yeh, a former chef at "Han Dynasty" restaurants in Exton,

Pennsylvania and, briefly, on the Upper West Side of Manhattan, brings wage claims under the

Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq.; New York Labor Law ("NYLL"),

N.Y. Lab. Law §§ 190 et seq., §§ 650 et seq.; and the Pennsylvania Minimum Wage Act of 1968

("PAMWA"), 43 P.S. §§ 333.101 et seq., against two Han Dynasty entities and a Han Dynasty

executive.  These are Han Dynasty, Inc., d/b/a Han Dynasty ("HDP"), which operates the Exton

restaurant; Han Dynasty Upper West Side Corp., d/b/a/ Han Dynasty ("HDUWS"), which

operates the Manhattan restaurant; and Lung-Lung Shen Chiang ("Chiang"), an officer of HDP.

Yeh's principal claims are that the defendants did not pay him overtime for his work and did not

inform him of his hourly pay rate.  He also alleges that defendants unlawfully failed to furnish

him with a new-hire notice at the time of his move to HDUWS and wage statements during his

tenure at HDUWS, in violation of the NYLL.

Following discovery, defendants have moved for summary judgment, principally on the ground that Yeh fell within the exemption to these wage laws for employees who work in a "bona fide executive . . . capacity."  *See* 29 U.S.C. § 213(a)(1).  For the reasons that follow, the Court grants defendants' motion on this basis.

## I.     Background[1]

### A.     Factual Background

Han Dynasty is a chain of Sichuanese restaurants with locations in New York, New Jersey, and Pennsylvania.  *See generally* FAC.  One such restaurant is HDP, a small family-owned restaurant located at 260 N. Pottstown Pike, in Exton, Pennsylvania.  Def. 56.1 ¶ 6.  HDP

---

[1] The Court draws its account of the underlying facts of this case from the parties' submissions in support of and in opposition to defendants' motion for summary judgment, including: defendants' memorandum of law in support of their motion for summary judgment, Dkt. 88 ("Def. Mem."); defendants' Local Rule 56.1 statement, Dkt. 90 ("Def. 56.1"); the declaration of William H. Ng, Esq., in support of defendants' motion for summary judgment, Dkt. 89 ("Ng Decl."), and attached exhibits; plaintiff's memorandum of law in opposition to defendants' motion for summary judgment, Dkt. 97 ("Pl. Mem."); plaintiffs' response to defendants' Local Rule 56.1 statement and Rule 56.1 counter-statement, Dkt. 98 ("Pl. 56.1 Resp."); the declaration of John Troy, Esq., in opposition to defendants' motion for summary judgment, Dkt. 96 ("Troy Decl."), and attached exhibits; and defendants' reply memorandum of law, Dkt. 99 ("Def. Reply Mem.").  For background facts only, the Court also cites Yeh's First Amended Complaint, Dkt. 38 ("FAC").

Citations to a party's Rule 56.1 statement incorporate by reference the materials cited therein. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").  As discussed later, Yeh, drawing on a reply declaration dated August 27, 2019 and submitted in opposition to defendants' motion for summary judgment, Troy Decl., Ex. 3 ("Yeh Reply Decl."), disputes many factual propositions in defendants' Rule 56.1 statement that were based, in whole or part, on Yeh's own deposition testimony.  The Court disregards these aspects of Yeh's reply declaration.  *See infra* note 12 (citing case authority).

is approximately 3,000 square feet with 40 dining tables and seating for 107 persons.  *Id*. ¶ 7.
HDP is owned by Chiang and her son; since HDP's opening, Chiang has served as HDP's
general manager.  *Id*. ¶¶ 8, 11.  Another such restaurant is HDUWS, located at 215 West 85th
Street, in Manhattan.  *Id*. ¶ 109.

Between May 2015 and January 2018, when his employment at HDP ended, Yeh held a
chef position at HDP and was referred to by defendants as the "head chef" or "*da shi fu*" there,
although Yeh disputes that this was an official title.  *Id*. ¶¶ 15, 39.  Regardless, it is undisputed
that, during that period, Yeh was the most senior cook at HDP.  *Id*. ¶ 39.[2]  Before HDP, Yeh had
more than 20 years' experience working at Chinese restaurants.  *Id*. ¶ 21.  Between
approximately 2009 and April 2014, Yeh had owned a Chinese restaurant in Chicago and, with
his wife, had managed the entire restaurant and its five employees, including kitchen workers.
*Id*. ¶ 24.  In the Chicago job, Yeh gained five years of restaurant management experience and has
described himself there as the "boss" who "managed everything."  *Id*. ¶ 26.

At HDP, Yeh, between June 2015 and June 2017, received semi-monthly company
payroll in the gross amount of $2,300 per pay period or $4,600 per month.  *Id*. ¶ 44.  Annualized,
his gross salary during this period was no less than $55,200.  *Id*. ¶ 45.  Between June 2017 and
January 2018, Yeh received semi-monthly company payroll checks in the gross amount of
$2,500 per pay period, or $5,000 per month, making his annualized gross salary for that period
no less than $60,000.  *Id*. ¶¶ 46–47.

The parties, while agreeing on numerous particulars, disagree over the precise extent to
which Yeh's duties at HDP included supervising employees, *see* Pl. 56.1 Resp. ¶¶ 50–76,

---

[2]  The parties disagree whether Yeh's start date at HDP was in January 2015 or later in the first
half of 2015, and whether he was initially hired as "deputy head chef" or merely a cook, *see id.*
¶¶ 33, 34.  That dispute is immaterial to the pending motion.

training and assessing employee performance, *see id*. ¶¶ 77–81, and managing kitchen personnel, *see id*. ¶¶ 82–90; as well as the extent to which Yeh participated in hiring, *id*. ¶¶ 91–100, handled customer complaints, *see id*. ¶¶ 101–03, and had duties with respect to food suppliers and overseeing food inventory, *see id*. ¶¶ 104–08.  The Court addresses those matters *infra*, as they are relevant to the question of whether Yeh fit within the executive exemption to the wage laws at issue.

As to HDUWS, Yeh alleges that he worked five days per week between April 22, 2016 and June 7, 2016, in the middle of his tenure at HDP.  Def. 56.1 ¶ 110.  In or around April 2016, defendant Chiang contacted Mei Da Liu ("Liu"), who was the head chef of HDUWS and a longtime friend of Yeh and who had originally referred Yeh to HDP, and told Liu that an inter-personal conflict had developed between Yeh and another chef (Liang) at HDP.  Chiang asked Liu if HDUWS could take Yeh on a temporary basis while Chiang resolved the conflict between Yeh and Liang.[3]  Chiang told Yeh that the assignment to HDUWS was temporary as Liang was sick and intended to return to China, and that Yeh would return to HDP.  *See id*. ¶¶ 118–19.  During Yeh's brief (5–6 week) stint at HDUWS, Yeh's salary did not change, and he continued to be paid by HDP.  *Id*. ¶¶ 121–22.

On or about June 8, 2016, Yeh returned to HDP, resumed his duties there, and worked at HDP until his last day of employment in January 2018.  *Id*. ¶ 124.  Yeh left HDP because he had previously told Chiang that he would work only until the end of 2017, and then wanted to retire. *Id*.

---

[3] Yeh does not admit that Chiang articulated to Liu the explanation that an interpersonal conflict required the transfer, but both Chiang (in her deposition) and Liu (in a declaration) so attest, and Yeh does not recite any contrary evidence.  *See* Pl. 56.1 Resp. ¶¶ 117–19 (citations omitted).

### B.      Procedural History

On July 2, 2018, Yeh filed a complaint, Dkt. 1, and, on October 19, 2018, after

defendants moved to dismiss, an amended complaint, FAC, which Yeh styled as a putative

collective and class action.  The FAC alleged that, during Yeh's work for HDP between

November 2014 and April 2016, he had worked 59.50 hours per week; that, during his work for

HDUWS between April 23, 2016 and June 7, 2016, he had worked 49.50 hours per week; and

that, during his work for HDP from July 1, 2017 to January 15, 2018, he had worked 56.17 hours

per week.  *See id.* ¶¶ 134–36.[4]

Yeh principally alleged that defendants had not paid him overtime for his work at either

restaurant, nor informed him of his hourly rate.  *See id.* ¶¶ 142, 145.  Yeh brought overtime

claims under the FLSA, *id.* ¶¶ 158–65, the PMWA, *id.* ¶¶ 166–71, and the NYLL, *id.* ¶¶ 172–76.

Yeh also brought claims under the NYLL for defendants' failure, allegedly, to provide him with

a wage-notice upon his transfer to HDUWS, *id.* ¶¶ 177–81, or wage statements while working

there, *id.* ¶¶ 182–85.

Yeh's FAC was brought against 13 Han Dynasty-affiliated entities.  These included

entities responsible for Han Dynasty restaurants in communities in New York, New Jersey, and

Pennsylvania in which Yeh had never worked, and seven officials affiliated with one or more of

these entities.

All defendants other than HDP, HDUWS, and Chiang moved to dismiss for lack of

personal jurisdiction, Fed. R. Civ. P. 12(b)(1), and failure to state a claim, *id.* 12(b)(6).  The

parties then briefed that motion.  *See* Dkts. 48, 51, 52.  On February 14, 2019, the Court issued

an opinion and order granting the motion to dismiss for failure to state a claim against the

moving defendants.  *See* Dkt. 53 ("MTD Decision").  The Court held that the FAC did not

---

[4] The FAC did not specify the number of hours Yeh worked between June 8 and June 30, 2016.

plausibly allege that any of those entities had been Yeh's employer. *See, e.g.*, *id*. at 17 ("Yeh's complaint is devoid of facts suggesting any connection between him and these other entities or the discrete Han Dynasty restaurants they managed.").

With the case limited to Yeh's claims against HDP, HDUWS, and Chiang, discovery ensued, supervised by the Hon. Henry B. Pitman, United States Magistrate Judge. *See* Dkt. 59. On August 1, 2019, after discovery closed, the Court held a pre-motion conference with respect to defendants' anticipated motion for summary judgment, and set a schedule for briefing that motion, Dkt. 84; *see* Dkt. 94 ("Tr.") (conference transcript).[5]

On August 16, 2019, defendants filed a motion for summary judgment, Dkt. 87, a supporting memorandum of law, Dkt. 88, a declaration from counsel, Dkt. 89, and a Rule 56.1 statement, Dkt. 90. On August 30, 2019, Yeh filed a memorandum of law, Dkt. 97, a declaration from counsel, Dkt. 96, and a counter Rule 56.1 statement, Dkt. 98, in opposition. On September 12, 2019, defendants filed a reply, Dkt. 99.

## II.   Discussion

Defendants move for summary judgment against Yeh's core claims for unlawful denial of overtime pay, principally[6] on the ground that the undisputed material facts establish that Yeh's

---

[5] At the August 1, 2019 conference, the Court orally denied Yeh's pending motion for collective and/or class certification. *See* Tr. at 6. The Court noted that Yeh and his counsel had failed to meet deadlines and had taken scant discovery, including missing the deadline to take defendants' Rule 30(b)(6) deposition. Certifying a collective and class led by Yeh, the Court found, would not be consistent with the Court's duty "to make sure that the people who are being added into this case are ably represented," *id.*; *see also* Dkt. 84 (written order memorializing bench ruling).

[6] Defendants separately ask the Court to enter partial summary judgment (1) to eliminate time-barred claims, *i.e.*, to limit Yeh's FLSA claims to those accruing from July 2, 2016 forward and to limit his claims under the PMWA to those accruing from July 2, 2015 forward; and (2) to clarify that Yeh's claims under the NYLL could at most apply to the period between April 22, 2016 and June 7, 2016, as Yeh worked outside of New York State at all other times. Def. Mem. at 3–5. In light of the holding that the executive exemption applies, the Court does not have occasion to resolve this aspect of defendants' motion.

employment fits within the categorical exemption from mandatory overtime requirements that the FLSA, the NYLL, and the PMWA provide for employees who, *inter alia*, work in a "bona fide executive, administrative, or professional capacity."[7]  *See* 29 U.S.C. § 213(a)(1); N.Y. Lab. Law § 651(5); 43 Pa. Stat. § 333.105 (together, the "executive exemption").

### A.    Applicable Legal Standards for a Motion for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  "[A] party may

---

[7] Defendants also separately move against Yeh's claims under the NYLL that defendants unlawfully failed to furnish him with (1) a new-hire notice at the time of his move to HDUWS and (2) wage statements during his tenure at HDUWS.  *See* Def. Mem. at 18–20.  Defendants are correct that these secondary claims are deficient as a matter of law.  Yeh has acknowledged receiving wage statements for this period.  *See* Def. 56.1 ¶ 121.  And even if a wage notice were required for Yeh's temporary transfer to the HDUWS kitchen while remaining an employee of and paid by HDP, under the NYLL, there is no liability for the lack of a wage notice where an employee has received all compensation due him.  *See* NY Lab. Law § 198(1-b).  Yeh's only basis for claiming to have received less than the pay due to him is his claim to overtime pay, which the Court rejects based on its finding that the executive exemption applies.  Notably, after defendants moved for summary judgment on these claims, Yeh did not oppose this motion, or proffer evidence on which these claims could be sustained.  *See Lobban v. Cromwell Towers Apartments, Ltd. P'ship*, 345 F. Supp. 3d 334, 343 (S.D.N.Y. 2018) (dismissing plaintiff's claim for improper wage statements under NYLL because plaintiff did not address defendants' arguments for dismissal of that claim); *Shang Shing Chang v. Wang*, No. 15 Civ. 4385 (FB) (ST), 2018 WL 1258801, at *1 n.1 (E.D.N.Y. Mar. 12, 2018) (dismissing claim where "plaintiffs claimed that they did not receive pay stubs" but "failed to respond to the defendants' motion for summary judgment on that claim").

not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). Rather, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## B.      Applicable Legal Standards Governing the Executive Exemption

The FLSA was enacted "to ensure that employees receive a fair day's pay for a fair day's work," *Gibbs v. City of New York*, 87 F. Supp. 3d 482, 490 (S.D.N.Y. 2015) (quoting *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 578 (1942)), and to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and [the] general well-being of workers," *Havey v. Homebound Mortg., Inc.*, 547 F.3d 158, 160 (2d Cir. 2008) (quoting 29 U.S.C. § 202(a)). Subject to certain exceptions, the FLSA requires that employees who work more than 40 hours per week be compensated for

overtime work at a rate of one and one-half times their regular rate of pay.  29 U.S.C.

§ 207(a)(1).  Analogous provisions of the NYLL[8] and the PMWA[9] similarly provide.

Employees are exempt from the FLSA overtime provision, however, if, *inter alia*, they are "employed in a bona fide executive . . . capacity."  29 U.S.C. § 213(a)(1).  The labor laws of New York[10] and Pennsylvania[11] adopt the same exemption.  The Court therefore analyzes Yeh's claims under the FLSA.

---

[8] *See* 12 N.Y. Comp. Codes R. & Regs. §§ 142–2.2 (providing overtime for employees); N.Y. Lab. Law § 651(5) (defining employee); *see also, e.g.*, *Fernandez v. HR Parking Inc.*, 407 F. Supp. 3d 445, 447 (S.D.N.Y. 2019); *Moses v. Griffin Indus., LLC*, 369 F. Supp. 3d 538, 544–45 (S.D.N.Y. 2019).

[9] 43 Pa. Stat. § 333.104(c); *see also, e.g.*, *Bayada Nurses, Inc. v. Com., Dep't of Labor & Indus.*, 607 Pa. 527, 552 (2010).

[10] NYLL § 651(5)(c) (restricting the definition of "employee" to "not include any individual who is employer or permitted to work . . . in a bona fide executive" capacity); 12 N.Y. Comp. Code R. & Regs. § 142–2.2 (providing overtime for employees).  "Because New York's overtime provisions mirror and/or expressly adopt federal wage law, federal courts evaluate New York's executive exemption by reference to the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201 *et seq.,* and its attendant regulations, set forth in the Code of Federal Regulations."  *Clougher v. Home Depot U.S.A., Inc.*, 696 F. Supp. 2d 285, 289 n.5 (E.D.N.Y. 2010) (citing *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 78 (2d Cir. 2003)); *see also, e.g.*, *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 555–56, 559–60 (2d Cir. 2012) (treating FLSA and NYLL executive exemptions as functionally equivalent); *Tamayo v. DHR Rest. Co.*, No. 14 Civ. 9633 (GBD), 2017 WL 532460, at *5 & n.5 (S.D.N.Y. Feb. 3, 2017) ("The NYLL has a substantially similar overtime provision with an analogous exception for executives."); *Martinez v. Hilton Hotels Corp.*, 930 F. Supp. 2d 508, 519 (S.D.N.Y 2013) (same).

[11] 43 Pa. Stat. § 333.105(a)(5) (stating that "[e]mployment in the following classifications shall be exempt from both the minimum wage and overtime provisions of this act" and listing employment in a "bona fide executive . . . capacity").  "Like the FLSA, the PMWA requires employers to pay employees an overtime rate not less than one and one-half times the employee's regular rate for hours worked in excess of forty in a workweek, and exempts from this overtime requirement employees employed '[i]n a bona fide executive, administrative or professional capacity.' . . .  Although the criteria for these exemptions under the PMWA are not identical to FLSA's criteria, the court agrees that the tests are sufficiently similar that the court's analysis regarding the FLSA exemptions also applies to the PMWA exemptions."  *Vanstory-Frazier v. CHHS Hosp. Co.*, No. 08 Civ. 3910 (WY), 2010 WL 22770, at *9 (E.D. Pa. Jan. 4, 2010); *see also Itterly v. Family Dollar Stores, Inc.*, 606 F. App'x 643, 645–46

An employer seeking to rely upon such an exemption as a defense to paying overtime bears the burden of proving that such exemption applies. *See, e.g.*, *Ramos*, 687 F.3d at 558; *Jeong Woo Kim v. 511 E. 5th St., LLC*, 133 F. Supp. 3d 654, 660 (S.D.N.Y. 2015). Until recently, it had been held, too, that because the FLSA is a remedial statute, its exemptions were to be construed narrowly against the employer. *See, e.g.*, *Reiseck*, 591 F.3d at 104. Citing authority to this effect, Yeh urges the Court to do so here. Pl. Mem. at 6. The Second Circuit, however, has repudiated that doctrine, holding that the FLSA's exemptions "'are as much a part of the FLSA's purpose as the overtime-pay requirement,' and courts therefore 'have no license to give the exemption anything but a fair reading.'" *Vasto v. Credico (USA) LLC*, 767 F. App'x 54, 56 (2d Cir. 2019) (quoting *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018)).

Whether an exemption applies to a particular employee is a mixed question of law and fact. *Ramos*, 687 F.3d at 558 (citation omitted). "The question of how the [employees] spent their working time . . . is a question of fact. The question whether their particular activities excluded them from the overtime benefits of the FLSA is question of law[.]" *Id.* (citing *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)).

As to the executive exemption specifically, the FLSA does not define the term "bona fide executive." It instead directs the Secretary of Labor to do so by regulation. 29 U.S.C. § 213(a)(1). The Department of Labor ("DOL") has defined an "employee employed in a bona fide executive capacity" as an employee:

---

(3d Cir. 2015) (applying FLSA standards to resolve PMWA claim); *Swank v. Wal-Mart Stores, Inc.*, No. 13 Civ. 1185 (MRH), 2018 WL 2684102, at *2 (W.D. Pa. June 5, 2018) ("The federal and state exemption at issue in this case is the bona fide executive exemption, which exempts employees in certain executive, managerial, and other decision-making roles from overtime wage requirements under the FLSA and the PMWA." (citations omitted)); *Paul v. UPMC Health Sys.*, No. 06 Civ. 1565 (JFC), 2009 WL 699943, at *8 n.1 (W.D. Pa. Mar. 10, 2009) ("The exemptions under both the FLSA and PMWA are identical. . . . The decision with respect to plaintiffs' FLSA claim is therefore dispositive of plaintiff's PMWA claim.").

(1) Compensated on a salary basis . . . at a rate of not less than $684 per week . . . ;

(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).  DOL regulations provide that the exempt or nonexempt status of an employee cannot be assessed from an employee's job title alone, but instead must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations.  29 C.F.R. § 541.2.

## C. Application of the Executive Exemption Here

Courts analyze the above criteria in terms of a "salary basis" component and a "duties" component.  *See, e.g.*, *Reich v. Waldbaum, Inc.*, 52 F.3d 35, 39 (2d Cir. 1995); *Martinez*, 930 F. Supp. 2d at 520.  The Court will do so here.

### 1. Was Yeh Compensated on a Salary Basis?

There is no genuine dispute that Yeh's employment satisfied the "salary basis" component of the exemption.

The salary requirement under the FLSA is $684 per week, *see* 29 C.F.R. § 541.100, under the NYLL was $975 per week as of January 2018 (Yeh's last date of work either in New York or Pennsylvania),[12] and was $250 per week under the PMWA, *see* 34 Pa. Code § 231.82(6).  It is undisputed that Yeh's salary well exceeded these thresholds throughout his employment.

---

[12] New York law mandates higher minimum weekly salaries than the FLSA, and also sets forth additional duties-based criteria to qualify for the executive exemption.  *See* 12 N.Y. Comp. Code R. & Regs. §§ 142–2.14(c)(4)(i)(e)(1)(i); 146–3.2(c)(1)(e)(1)(i).

Between June 2015 and June 2017, Yeh received semi-monthly payroll checks of $2,300 per pay

period ($4,600 per month), which equates, even in a 31-day month, to $1,038.71 per seven-day

period, and his annualized gross salary was no less than $55,200, which averages to $1,061.54

per week.  *See* Def. 56.1 ¶¶ 44–45.  Between June 2017 and January 2018, Yeh received semi-

monthly payroll checks of $2,500 per pay period ($5,000 per month), which equates, even in a

31-day month, to $1,129.03 per seven-day period, and his annualized gross salary was no less

than $60,000, which averages to $1,153.85 per week.  *See id.* ¶¶ 46–47.  Notably, Yeh's brief in

opposition to summary judgment, while contesting aspects of the duty component of the

executive exemption inquiry, is silent as to the salary basis component.  *See* Pl. Mem. at 7.

## 2.      Did Yeh's Duties Satisfy the Exemption's Requirements?

The parties, however, dispute whether the nature and scope of Yeh's duties establishes

that his employment satisfied the "duties" component of the inquiry, which is comprised of the

remaining three factors cited above.  29 C.F.R. § 541.100(a)(2)–(4).  "Consideration of these

factors is a highly fact-intensive inquiry, to be made on a case-by-case basis in light of the

totality of the circumstances."  *Martinez*, 930 F. Supp. 2d at 523 (quoting *Clougher v. Home*

*Depot U.S.A., Inc.*, 696 F. Supp. 2d 285, 290 (E.D.N.Y. 2010)).  Defendants argue that the

undisputed evidence establishes the factors.  Yeh argues that disputes of material fact preclude a

determination, pretrial, of whether they are met.

Because limited discovery was taken, the evidence bearing on this inquiry largely derives

from two depositions and three declarations.[13]  These are: Yeh's deposition, taken July 12, 2019,

*see* Ng Decl., Ex. D and Troy Decl., Ex. 1 ("Yeh Dep."); Chiang's deposition, taken July 23,

2019, *see* Ng Decl., Ex. E and Troy Decl., Ex. 2. ("Chiang Dep."); Chiang's declaration, dated

---

[13] The parties cite limited documentary evidence, almost all of which consists of pay records
relating to the salary component of the executive exemption inquiry.  *See* Ng Decl., Ex. I.

May 9, 2019, *see* Ng Decl., Ex. F. ("Chiang Decl."); the declaration of non-party Tzi Wei Wang,

dated May 10, 2019, *see id.*, Ex. G. ("Wang Decl."); and the declaration of non-party Mei Da

Liu, dated August 16, 2019, *see id.*, Ex. H ("Liu Decl.").[14]  Wang, between January 2015 and at

least the date of his declaration, held the position of restaurant manager at HDP.  *See* Def. 56.1

¶ 12.  Liu, as noted, was at all relevant times the head chef at HDUWS.  *See id.* ¶ 32.

> a.      Was Management Yeh's "Primary Duty"?

An employee's "primary duty" is the "principal, main, major or most important duty that

the employee performs."  29 C.F.R. § 541.700(a).  It must be assessed based on all of the facts

"with the major emphasis on the character of the employee's job as a whole."  *Id.*  Relevant

factors

> include, but are not limited to, the relative importance of the exempt duties as
> compared with other types of duties; the amount of time spent performing exempt
> work; the employee's relative freedom from direct supervision; and the
> relationship between the employee's salary and the wages paid to other
> employees for the kind of nonexempt work performed by the employee.

*Id.*

The Department of Labor has set forth a non-exhaustive list of activities that constitute

"management."  Such activities include:

---

[14] Yeh also submitted a reply declaration, Yeh Reply Decl., which contradicts significant aspects of his deposition testimony.  However, a party may not "create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."  *Clayborne v. OCE Bus. Servs.*, 381 F. App'x 32, 35 (2d Cir. 2010); *see also Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 205 (2d Cir. 2014); *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).  "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.  Thus, factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not genuine issues for trial."  *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) (internal quotation marks and citation omitted).  Yeh's reply declaration forms a significant, and in some cases the only, basis for his dispute of various facts treated by defendants as undisputed.  *See, e.g.*, Def. 56.1 ¶¶ 56–57, 60, 62–65, 68, 70–72, 82, 84–85, 89, 93–94, 97.  Where Yeh's deposition establishes these facts or disclaims knowledge as to them, the Court has disregarded his reply declaration.

interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

*Id.* § 541.102; *see also Karropoulos v. Soup du Jour, Ltd.*, 128 F. Supp. 3d 518, 530–33

(E.D.N.Y. 2015); *Trimmer v. Barnes & Noble, Inc.*, 31 F. Supp. 3d 618, 625 (S.D.N.Y. 2014);

*Martinez*, 930 F. Supp. 2d at 524–25.

Here, based on the undisputed facts, including as admitted by Yeh in his deposition, Yeh performed a very substantial number of managerial duties in connection with HDP's six-member kitchen team.[15]  *See* Pl 56.1 Resp. ¶ 52.  These included:

- Making recommendations or voicing, in person or over the phone, complaints to Chiang as to the performance of other kitchen workers, *see* Def. 56.1 ¶ 56; Yeh Dep. at 63–65 ("I would inform about bad work" or say "that this particular person was not working hard enough"); *id.* at 194 (estimating that he complained to Chiang at least 10 times about kitchen workers but that he no longer remembers how many he times he complained);

- Evaluating, based on his experience, the dishes prepared by potential new hires, to see "if it's ok," because a dish "cannot . . . deviate too much," *see* Def. 56.1 ¶ 77; Yeh Dep. at 131–32;

---

[15] It is undisputed that Yeh did not have "front of the house" managerial responsibilities.  Such were Wang's responsibility.  Def. 56.1 ¶¶ 14, 58.

- Similarly evaluating, based on his experience, the dishes prepared by kitchen staff to ensure consistency and quality, *see* Def. 56.1 ¶¶ 40–41; Yeh. Dep. at 154;

- Telling other chefs to redo dishes that were not to his liking, *see* Def. 56.1 ¶ 79;

- Instructing kitchen staff who were not where they were supposed to be within the kitchen to return to their place, Yeh Dep. at 166–67;

- Intervening with the employee responsible for dishwashing when dishes were not washed cleanly, *id.* at 133;

- Assuring "food quality control," Def. 56.1 ¶ 62, including directing employees to throw away ingredients that were not fresh enough, to get ingredients from the refrigerator, and to buy ingredients that were in short supply, Yeh Dep. at 128–29, 136–38; *see also* Def. 56.1 ¶ 63 (Yeh was responsible for "quality of the food");

- Checking food service deliveries, Def. 56.1 ¶ 106, and, where the food supplier failed to deliver something, calling the supplier to advise them what was missing from the delivery, *id.* ¶ 107, requesting that the food be delivered on the next scheduled delivery date, and reviewing the ensuing delivery to assure that the missing items were received, *id.* ¶ 108;

- Instructing cooks to properly prepare dishes, for example, assuring that onions were peeled well, Yeh Dep. at 133;

- Conducting daily and weekly inventory checks and ordering food and supplies approximately three times per week, Def. 56.1. ¶ 55;

- Coordinating switches of kitchen employees' schedules or being notified of switches that employees had privately arranged, so as to assure coverage, *see id.* ¶ 54, Yeh Dep. 167;

- Assuring that the kitchen was clean on a daily basis, Def. 56.1 ¶ 75;

- In the event of a health inspection, where cleaning tasks were divided up among all kitchen workers, checking the work to make sure the kitchen was cleaned up according to Yeh's standards, *id.* ¶ 76;

- In the rare event of internal disputes within the kitchen, trying to persuade employees to calm down in order to resolve the disputes, *id.* ¶ 88; and

- When a customer was unhappy with a dish, speaking with restaurant manager Wang to resolve customer complaints, *id.* 56.1 ¶¶ 59, 101–03.

At the same time, as to certain responsibilities which defendants' witnesses attest Yeh had, Yeh disputed these claims.  Most notably, these included:

- The extent to which Yang was involved in the hiring and firing process, including whether Yeh hired and fired other employees, contacted local employment agencies to find kitchen staff workers, recommended other employees to Chiang for hiring or firing, or conducted interviews of such employees (as opposed to evaluating the dishes cooked by prospective chefs), *see* Pl. 56.1 Resp. ¶¶ 56, 91–98;

- Whether Yeh was holistically responsible for reviewing "the work of the others," *id.* ¶ 64, or had overall supervisory authority over the kitchen workers, *id.* ¶ 71.

There is also competing testimony about whether Yeh formally held the job title at HDP of "head chef," or "*da shi fu*" at HDP between May 2015 and his retirement.  *Compare* Def. 56.1 ¶¶ 15, 39 (attesting that he was head chef), *with* Pl. 56.1 Resp. ¶¶ 15, 39 (attesting to the opposite).  However, Yeh admits that defendants have referred to him as such, *see* Pl. 56.1 Resp. ¶ 15; that his initial post at HDP was "deputy chef," Yeh Dep. at 110; and that he took on the

role of "most senior chef" at HDP in May 2015 after his predecessor (Gu) left because "the boss asked me to do it. So I did it," Yeh Dep. at 151.[16] Yeh also admits that the "head chef" or "*da shi fu*" in a kitchen is responsible for "maintain[ing] the quality of the ingredient[s] in the kitchen" and "mak[ing] sure that everyone did the job well," both of which were among his responsibilities. Def. 56.1 ¶¶ 40–41.

In light of the above testimony, whatever the semantic differences are among the parties as to Yeh's title, it is unavoidably clear that Yeh's primary duties within the HDP kitchen were managerial. To be sure, as Yeh notes, he also functioned as a working chef at HDP, *see* Pl. Mem. at 7–8, which is undisputed. And, on defendants' motion for summary judgment, the Court must credit Yeh's testimony on the disputed points as to whether he held an official title within the kitchen or whether he was formally delineated as having overall supervisory authority within the kitchen. But the range of specific duties that Yeh held make clear that— functionally—Yeh personally managed HDP's kitchen operations and that such was his primary responsibility. In particular, as the above roster of Yeh's admitted responsibilities reveals, Yeh in multiple ways supervised and monitored the performance of the other workers, including those whom Yeh described as the "dishwasher," "ingredient mixer," "meat preparer," and "all[-]around helper." *See* Yeh Dep. at 60, 110; Def. 56.1 ¶ 51; Pl. 56.1 Resp. ¶ 51. And Yeh oversaw the operation of the kitchen's daily and weekly operations, including taking responsibility for overall food quality and for the kitchen's interactions with outside vendors.

---

[16] Yeh, through an interpreter, also referred to himself as *da shi fu* during his deposition. *See* Yeh Dep. at 195 ("Q. When you were working at the Han Dynasty, Exton location, what were your job duties? A. When I was at Exton, I was the *da shi fu*."), 205 ("[A]s the *da shi fu* [I] had to be responsible for the quality of the food . . . ."). Because the parties disputed the proper translation of this term, *see, e.g.*, Yeh Dep. at 112–13, 196, it was not translated in the deposition transcript.

Confirming Yeh's predominantly managerial status, too, is Yeh's acknowledgement that his responsibilities aligned with those he admits are held by a "head chef" or "*da shi fu*" in a Chinese restaurant's kitchen.  *See* Yeh Dep. at 196–97, 205.  That Yeh came to HDP with extensive experience as the kitchen manager (and owner) of Chinese restaurants, *see generally* Def. 56.1 ¶¶ 21–31, also logically accords with his playing a predominantly managerial role in the kitchen.  Notably, Yeh does not identify an alternative manager.  Instead, attempting to defeat defendants' summary judgment motion, he improbably depicts HDP's kitchen as leaderless and communitarian.  In a new declaration that seeks to repudiate much of his deposition testimony, Yeh describes a kitchen in which each member was autonomous and "knew what they were supposed to do," with the result that "no one needed any supervision." Yeh Reply Decl. ¶¶ 23–24.  Yeh's deposition, however, controls, *see supra* note 12, and the facts to which Yeh testified—revealing his supervision over the kitchen's food preparation, quality, inventory, schedule, and interactions with vendors—are inconsistent with his portrait.

Seeking to counter the conclusion that his kitchen role was predominantly managerial, Yeh argues that his hours were primarily spent cooking.  In his deposition, Yeh demurred as to the number of hours he spent in a 10-hour workday cooking, stating only that "[t]hat varies," *see* Yeh Dep. at 198, whereas defendants' witnesses estimated he spent 3–4 hours a day cooking, *see* Def. 56.1 ¶ 60.  Attempting to defeat summary judgment, Yeh's new declaration states that he had spent "at least 5 hours per day" cooking during a typical workday.  Yeh Decl. ¶ 35. However, even assuming that Yeh's post-deposition recollection of his hours was cognizable, that testimony would not carry the day in light of his admission to broad-ranging managerial tasks.  That is because, although the percentage of an employee's time spent performing exempt versus nonexempt work is an "important" factor, it is not dispositive.  *Paganas v. Total Maint.*

18

*Sol., LLC*, 726 F. App'x 851, 853–54 (2d Cir. 2018) ("An employee's 'primary duty' is the 'principal, main, major or most important duty that the employee performs.' . . . Merely performing some nonexempt duties, however, does not mean that an employee's primary duty was not management." (quoting 29 C.F.R. § 541.700(a))); *Callari v. Blackman Plumbing Supply, Inc.*, 988 F. Supp. 2d 261, 277 (E.D.N.Y. 2013) ("With respect to time spent performing exempt work, while 'employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement[,] [t]ime alone . . . is not the sole test' and 'exempt employees need not spend more than 50 percent of their time performing exempt work.'" (quoting 29 C.F.R. § 541.700(b))).[17]  Moreover, "exempt executives generally make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work, whereas a nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined periods." *Martinez*, 930 F. Supp. 2d at 524 (quoting 29 C.F.R. § 541.106(a)).  Yeh's cooking duties, as represented in his deposition testimony, are entirely consistent with this definition of a management role.

Yeh's predominantly managerial duties are, finally, corroborated by testimony indicating that Yeh's compensation (initially $55,000/year; later $60,000/year) significantly exceeded that

---

[17] *See also Morrison v. Cty. of Fairfax*, 826 F.3d 758, 772–73 (4th Cir. 2016) (holding that primary duty element did not support an application of the executive exemption even though Fire Department captains had high rank and managerial responsibilities, because emergency response was "the[ir] most important job"); *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1115 (9th Cir. 2001) ("The Baldwins' principal value to Trailer Inns was directing the day-to-day operations of the [trailer park] even though they performed a substantial amount of manual labor."); *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1227 (5th Cir. 1990) ("[T]he employee's primary duty will usually be what she does that is of principal value to the employer, not the collateral tasks that she may also perform, even if they consume more than half her time.") *Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir. 1982) ("[O]ne can still be 'managing' if one is in charge, even while physically doing something else.").

of the other kitchen staff.  Chiang attested without contradiction that Yeh had the highest pay among the kitchen staff, and that his pay ($2,300 per pay period initially) was more than twice the compensation of the dishwasher (approximately $1,000 per pay period) and significantly exceeded that of the meat preparer and wok chef (both of whom earned between $1,000 and $1,500 per pay period).  Def. 56.1 ¶¶ 48–49.  Yeh argues that Chiang's testimony is not properly considered, but that is wrong.  Chiang owned HDP and attested to personal knowledge of the kitchen workers' pay.  *See* Chiang Decl. ¶¶ 3–4; Chiang Dep. at, *e.g.*, 7–9.  Yeh, notably, noticed Chiang's deposition as a Rule 30(b)(6) witness for HDP, but failed to take this deposition.

The Court accordingly finds that defendants have established, overwhelmingly, the first of the factors relating to Yeh's duties.  These were primarily managerial.

> b.   *Did Yeh Customarily and Regularly Direct the Work of Two or More Other Employees?*

Substantially for the reasons reviewed above, defendants have also established the second "duty factor"—that Yeh regularly supervised two or more employees.  29 C.F.R. § 541.100(a)(3).

Yeh's testimony itself established that the HDP kitchen staff included, at all times, two or more workers other than himself.  Defendants, drawing on multiple sources including Yeh's testimony, list these as including the wok chef (also known as the deputy head chef), the expo chef (also known as the sorter), the appetizer chef, the prep chef (also known as the meat preparer), and the dishwasher.  Def. 56.1 ¶ 51; *id.* ¶ 52 (identifying by name the employee(s) in each position).  Yeh quibbles with the titles for each position, but he admits the kitchen staff "consisted of six employees," whom he titles "big chef, secondary chef, appetizer preparer, sorter (ingredient mixer), meat preparer / all around helper, and dishwasher / all around helper." Pl. 56.1 Resp. ¶ 51.

20

And, as reviewed above, Yeh supervised the overall kitchen staff.  His duties in that role included giving direction to the kitchen workers as to a range of critical tasks, including relating to food preparation and quality control, ingredient inventory and ordering, kitchen clean-up, scheduling, and employee disputes.  This prong of the duty inquiry is also easily satisfied.

### c.   Did Yeh Have Hiring and Firing Authority?

The final element of the "duties" test is whether Yeh "ha[d] the authority to hire or fire other employees" *or* whether his "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."  29 C.F.R. § 541.100(a)(4); *see also, e.g.*, *Tamayo*, 2017 WL 532460, at *11, 12; *Karropoulos*, 128 F. Supp. 3d at 534–35.  The DOL regulations suggest that factors to consider for this element include, but are not limited to, "whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon."  29 CFR § 541.105.  Particularly relevant here, the regulations counsel that, "[a]n employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status."  *Id.*

Of the three "duties" factors, this poses the greatest challenge to defendants' summary judgment motion.  Defendants do not suggest that Yeh had the authority to hire or fire other employees within the HDP kitchen and there is no basis to claim that he did.  The parties dispute, however, whether Yeh's "suggestions and recommendations" as to the employment of other kitchen workers carried particular weight.  Yeh relies on his testimony that only once did he ask

21

Chiang to let go of another employee (Pin Jun Yue), and that Chiang initially spurned this advice, transferring Yeh temporarily to HDUWS.  *See* Pl. Mem. at 12.

The other evidence before the Court, however, including Yeh's own deposition, lends support to this factor.

First, as to Yue, Chiang's undisputed testimony was that she "had no choice but to listen to master Yeh" and therefore adopted his recommendation to terminate Yu from HDP.  *See* Def. 56.1 ¶ 98.

Second, Yeh testified that on at least 10 occasions, he made complaints to Chiang about the performance of kitchen workers.  He made these complaints by telephone, and in person.  His complaints informed Chiang "about bad work" or "that this particular person was not working hard enough."  Yeh Dep. at 63–65, 194.

Third, Yeh's reply declaration added that he had recommended to Chiang that she hire Liang, whom Yeh described as his teacher, because Liang "needed a job."  Yeh Reply Decl. ¶¶ 16–18.  Chiang's undisputed testimony is that she hired Liang to fill Yeh's former role as deputy head chef, Def. 56.1 ¶ 94, much as Yeh's predecessor as head chef (Gu) had recommended, and Chiang had approved, Yeh's hire for the same position when Yeh joined HDP.  *See id.* ¶ 37.

The undisputed evidence therefore supports that Yeh made recommendations as to hiring and firing that carried weight with Chiang.  To be sure, the record reflects a limited number of such instances.  But this is unsurprising in light of the small size of the HDP kitchen and the limited time-span at issue.  *See Rooney v. Town of Groton*, 577 F. Supp. 2d 513, 530–31 (D. Mass 2008) (granting summary judgment for employer in light of exemption, and noting that size of department "should be taken into account" in assessing frequency of recommendations

made by plaintiff as it is "reasonable to assume that generally a smaller police department would have correspondingly fewer new hires, fires and promotions"); *accord Madden v. Lumber One Home Ctr., Inc.*, 745 F.3d 899, 906 (8th Cir. 2014) (finding relative size of business and corresponding number of personnel actions relevant to this element of the executive exemption).

The Court therefore finds that the executive exemption applies and defeats Yeh's claims that he was unlawfully denied overtime pay.

### 3.    Yeh's Stint at HDUWS

A final issue is presented by Yeh's brief (approximately six-week) stint at HDUWS in the course of his employment at HDP. Although Yeh does not distinctly press the point, he has available to him the argument that the evidence on which the Court has held that his employment at Han Dynasty satisfies the executive exemption derives entirely from his time at HDP.[18] Yeh could conceivably argue that, even if the exemption defeats his overtime claims as to HDP, he is still entitled to overtime pay for his six weeks at HDUWS.

The Court, however, having considered such an argument, rejects it. The undisputed evidence, including the testimony of decisionmaker Chiang, makes clear that Yeh's assignment transfer to HDUWS was at all times intended to be temporary. Def. 56.1 ¶¶ 118–19. Yeh's salary did not change; his job title (however formulated) and responsibilities at HDP did not change; and he continued to receive paychecks from HDP. *See id.* ¶ 121. During this period, Yeh therefore remained an executive at HDP in a real sense. Notwithstanding his brief tour of duty elsewhere, his permanent job retained the same features and responsibilities before the

---

[18] The undisputed evidence does, however, separately reflect that while at HDUWS, Yeh was a "wok chef who had the ability to direct the kitchen all-around helper and dishwasher to do work in the kitchen and such workers performed work for all chefs including [Yeh]." Def 56.1 ¶ 123. Were the question of whether Yeh's tenure at HDUWS satisfied the executive exemption properly before the Court, this fact, although not establishing the other duty factors, would tend to establish the second "duties" factor and would assist defendants in establishing the first.

temporary assignment and after.  The Court therefore holds that Yeh remained a kitchen

executive at HDP, and that defendants are entitled to invoke the circumstances relating to his

permanent posting at HDP in arguing that the exemption applied during Yeh's stint at HDUWS.

## CONCLUSION

For the reasons set out in the foregoing opinion, the Court grants defendants' motion for

summary judgment in its entirety.  The Clerk of Court is respectfully directed to terminate the

motion pending at docket 87 and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: February 24, 2020
      New York, New York